# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**RICHARD E. KENNEDY,**

   **Plaintiff,**

*vs.*             **Civil Action No. 3:05CV22**
                **(Judge W. Craig Broadwater)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

   **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

   Richard E. Kennedy brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on Plaintiff's Statement of Errors and Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

## I. Procedural History

   Richard E. Kennedy ("Plaintiff") filed an application for SSI on April 4, 2003, alleging disability since January 30, 2003, due to emphysema, asbestosis, and "heart problems" (R. 239-42). On April 9, 2003, Plaintiff filed a claim for DIB, alleging disability since January 30, 2003, due to emphysema, asbestosis, and chronic obstructive pulmonary disease ("COPD") (R. 59-60, 61-64, 101-10). The state agency denied Plaintiff's application initially and on reconsideration (R. 40, 41, 42-45, 48-49). Plaintiff requested a hearing, which Administrative Law Judge Barbara Gibbs

("ALJ") held on May 25, 2004, in Wheeling, West Virginia, and at which Plaintiff, represented by counsel, Julie Smith, and Dr. Larry Ostrowski, a vocational expert ("VE") testified (R. 255-300). On September 5, 2004, the ALJ entered a decision finding Plaintiff was not disabled (R. 15-23). On January 28, 2005, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 5-7).

## II. Statement of Facts

Plaintiff was born on March 9, 1953, making him fifty-one (51) years old at the time of the administrative hearing (R. 16, 61). Plaintiff completed his GED in 1972 (R. 108). His past work included that of a laborer in asbestos removal and in a cabinet-making shop (R. 103). Plaintiff stopped working on January 30, 2003 (R. 260).

On November 23, 1996, Plaintiff underwent a MRI of his lumbar spine. The MRI was normal (R. 195).

On July 15, 1998, Plaintiff underwent an echocardiogram at Reynolds Memorial Hospital. The following was found: 1) normal dimensions of cardiac chambers; 2) mild concentric hypertrophy of left ventricle; 3) preserved left ventricular functions and no regional wall motion abnormality; 4) no pericardial effusion; 5) normal aortic valve; 6) normal mitral valve; 7) normal tricuspid valve; and 8) normal color flow (R. 186).

On July 15, 1998, the results of Plaintiff's Holter monitor (twenty-four hours) were: 1) basic rhythm as sinus rhythm; 2) sinus bradycardia down to thirty-nine minutes; 3) no sinus tachycardia; 4) rare "PVC": 5) no sustained or symptomatic dysrhythmia; 6) no malignant pauses; 7) no advanced degree of "AV" block"; 8) no significant "ST" segmental changes (R. 184).

On July 3, 2002, Plaintiff was examined by Victorino Chin, M.D., for complaints of

shortness of breath when he climbed stairs or "hills." Plaintiff informed Dr. Chin he smoked one and one-half packages of cigarettes per day and drank one case of beer or more each weekend. Dr. Chin noted Plaintiff's past history was positive for hypertension, COPD, and tobacco dependency. Dr. Chin observed Plaintiff's respiratory effort to be "easy" with no wheezing in his lungs (R. 191). Dr. Chin found Plaintiff's hypertension to be "fair" and he ordered a lipid profile of Plaintiff. He instructed Plaintiff to return in six weeks (R. 192).

On November 15, 2002, Plaintiff was admitted to Reynolds Memorial Hospital for treatment of left upper lobe pneumonia (R. 165).

On November 16, 2002, a chest x-ray was taken of Plaintiff. It revealed "left upper lobe/left perihilar infiltrate" and "2.5 cm cavity containing an air fluid level in the same location." Plaintiff's lungs were otherwise clear and contained no pleural fluid. Plaintiff's heart was a normal size and his mediastinal structures were unremarkable (R. 172). A CT scan of Plaintiff's thorax was also made on November 16, 2002. It showed "left upper lobe infiltrate and a fluid level medially adjacent to the infiltrate." According to the CT scan, the "fluid level [was] most likely within an existing bulla" and there was "a slight thickening of the wall." "Multiple bullae [were] noted medially adjacent to the mediastinum bilaterally." Plaintiff's lungs were otherwise clear lungs and contained no pleural fluid (R. 173).

Also on November 16, 2002, Melvin Saludes, M.D., performed a consultative examination of Plaintiff. Dr. Saludes noted Plaintiff's medical history included "coronary artery disease, status post stent, hypertension and hyperlipidemia." Dr. Saludes also noted Plaintiff was positive for "alcoholism, seizure disorder, tobacco dependency and COPD." Dr. Saludes noted Plaintiff's medications included nitroglycerin, Diovan, Lipitor, aspirin, and Advair. Dr. Saludes' examination

3

of Plaintiff revealed the following: he was afebrile; his vital signs were stable; he was well nourished and well developed; he was in no acute respiratory distress at rest; he had diminished air exchange; there were no rales or wheezes; his heart was regular; and his abdomen was soft and nontender (R. 165). Dr. Saludes assessed left upper lobe pneumonia, bullous lung disease, COPD, and tobacco dependency. Dr. Saludes "strongly advised" Plaintiff to cease smoking (R. 166).

On December 27, 2002, Plaintiff returned to Dr. Chin for a follow-up examination after his hospitalization for pneumonia. Again he noted Plaintiff smoked one and one-half packages of cigarettes per day and drank one case or more of beer each weekend. Dr. Chin noted Plaintiff's respiratory effort was easy and his lungs were without wheezing or rales (R. 138).

On January 5, 2003, Plaintiff returned to Reynolds Memorial Hospital for a chest x-ray. The test showed Plaintiff's mediastinum and heart were normal, his lungs were clear, and the "infiltrate present in the left lung" in November, 2002, had resolved. The impression was for no active pulmonary disease (R. 135).

On March 26, 2003, Plaintiff returned to Wheeling Health Right for medical care after a two-year absence. The physician noted Plaintiff acted as though they "were long lost friends." Plaintiff complained of shortness of breath and inability to get medication because of financial difficulties. Plaintiff stated he had tried Wellbutrin for smoking cessation but had increased his smoking from two packages per day to three packs per day. Plaintiff informed the doctor he was "giving up on smoking cessation." The physician diagnosed shortness of breath and mixed emphysema/asbestosis. Plaintiff was prescribed Atrovent, Albuterol, Prilosec, folic acid, and Tiazac (R. 217).

On April 22, 2003, Plaintiff had a x-ray made of his chest. It revealed his heart was a normal size, his lungs were clear, and his mediastinal structures and pleural spaces were unremarkable. The

4

x-ray showed no significant changes from the January, 2003, chest x-ray. It was normal (R. 134).

On April 30, 2003, Plaintiff returned to Wheeling Health Right. The examining physician observed some shortness of breath at "baseline," but "no sputum/cough." Plaintiff was diagnosed with COPD; coronary artery disease, but no complaints and Plaintiff was stable; high cholesterol; alcohol abuse; and gastroesophageal reflux disease. The doctor prescribed a new nebulizer for home use, Lipitor, Prednisone, and Prilosec to Plaintiff (R. 216).

On June 8, 2003, Fulvio R. Franyutti, M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Franyutti found Plaintiff had no exertional, postural, manipulative, visual, or communicative limitations (R. 197-200). He found Plaintiff was unlimited in his exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, and hazards. The state-agency physician found Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation (R. 200). Dr. Franyutti found Plaintiff's RFC was not affected by any limitation (R. 201).

On June 25, 2003, Plaintiff underwent a pulmonary function study (R. 204-07). It showed "mild" obstruction pulmonary impairment (R. 205).

On August 20, 2003, Plaintiff presented to Wheeling Health Right for a check up. He stated he was experiencing "no problems"; however, Plaintiff stated he was experiencing severe mood swings and coughing spells. Plaintiff stated he became "easily tachycardic with "very little stress." Plaintiff informed the doctor that a x-ray revealed a "'bad blib'" in his lung. The doctor at Wheeling Health Right diagnosed stable COPD; stable CAD; alcohol abuse; and "possibly" some depression (R. 215).

On September 6, 2003, Plaintiff presented to Wheeling Health Right with "back problems.

due to his having pushed a "van 4 days ago" while he was intoxicated (R. 213-14). During examination, Plaintiff's respiration was good, his heart was regular, and his lungs were clear. Plaintiff's reflexes were equal bilaterally and his pulses were palpable. Plaintiff's straight leg raise test was negative bilaterally. Plaintiff was diagnosed with back pain and prescribed Robaxin and Naproxen. Plaintiff was injected with Toradol and DepoMedrol (R. 213). Plaintiff stated he experienced pain between his shoulders, which radiated down to his right knee (R. 214).

On September 9, 2003, Plaintiff reported to the Emergency Department of the Reynolds Memorial Hospital for pain located in his shoulder and which radiated to his hips and right knee. Plaintiff noted his pain was a four on a scale of one-to-ten. Plaintiff stated he had experienced a back injury as a "kid." The emergency department physician noted the September 6, 2003, x-ray of Plaintiff's back was negative. Plaintiff's range of motion was limited due to complaints of pain. Plaintiff was diagnosed with musculoskeletal back pain and instructed to continue taking Naproxen and Robaxin (R. 235).

Plaintiff did not keep his appointment at Wheeling Health Right on September 24, 2003 (R. 211).

On October 6, 2003, Plaintiff returned to the Reynolds Memorial Hospital's Emergency Department with complaints of shortness of breath and a "harsh, congested cough" (R. 234). Plaintiff stated he experienced pain in back of his ribs when he coughed (R. 234-35). Plaintiff was diagnosed with acute exacerbated COPD and bronchitis (R. 234)

On October 9, 2003, Plaintiff reported to Wheeling Health Right. He informed the physician he had been treated at the Emergency Department of Reynolds Memorial Hospital for an upper respiratory infection with Zithromax and Prednisone (R. 210-11). According to the medical records, Plaintiff, although he understood he needed to "quit smoking," continued to smoke during his illness

6

with the upper respiratory infection. Plaintiff's color was good; he was alert and oriented; his "TM's" were clear; and his pharynx was clear. Plaintiff had erythematous turbinates and copious mucus. Plaintiff was also positive for expiratory wheezes and rhonchi in both lobes. Plaintiff was diagnosed with acute bronchitis. Plaintiff was prescribed Robitussin and Rhinocort and provided a refill of his Zithromax (R. 210).

On October 29, 2003, Plaintiff was examined at Wheeling Health Right. He stated his back pain had improved. It was noted Plaintiff had good back posture and good range of motion. Plaintiff's assessment was for back pain, which was controlled by Robaxin; COPD, which was stable; CAD, which was stable; GERD, which was stable; hypercholestrolemia, for which he was prescribed Lipitor; alcohol abuse, for which he was prescribed folic acid; and hypertension, which was stable. Plaintiff was instructed to return to Wheeling Health Right in two to three months (R. 232).

On October 30, 2003, Plaintiff's Wheeling Health Right records were "sent to WV Disability" (R. 232).

On November 6, 2003, Thomas Lauderman, D.O., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Lauderman found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 220). Dr. Lauderman found Plaintiff had no postural, manipulative, visual or communicative limitations (R. 221-23). Dr. Lauderman found Plaintiff was unlimited in his exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, and hazards. Dr. Lauderman found Plaintiff should avoid concentrated exposure

to fumes, odors, dusts, gases, and poor ventilation (R. 223). Dr. Lauderman found Plaintiff's RFC was reduced to medium (R. 224).

On January 21, 2004, Plaintiff presented to Wheeling Health Right for a follow-up to his back pain. Plaintiff stated he had experienced back pain for many years. Plaintiff's gait was antalgic; neck was without bruit; heart had regular rhythm; lungs were clear to auscultation; right pelvic tender; and "neuro grossly intact." Plaintiff experienced pain at his right sacroiliac joint. Plaintiff was diagnosed with sacroilitis; hypertension, stable; increased lipids, stable; COPD, but continued to smoke; chronic lumbosacral strain; and CAD, for which he was to continue nitrates. Plaintiff was instructed to begin physical therapy. Plaintiff was prescribed Robaxin (R. 230).

At the May 25, 2004, hearing, Plaintiff testified he left his job as a cabinet refinisher on January 30, 2003, because he could not "stand standing up all the time" and he had difficulty breathing (R. 260, 261). Plaintiff testified that he was treated by Dr. West at Wheeling Health Right on a monthly basis and that he was tested by other doctors (R. 262, 263). Plaintiff testified his hypertension, "stomach problem," and cholesterol were managed with medications (R. 264-65).

Plaintiff testified at the administrative hearing that his activities of daily living included the following: he needed no assistance with grooming; he rose at 5:00 a.m.; he retired at 10:00 p.m.; he slept for four hours; Plaintiff rested in the day once or twice a week "when the spirit" moved him; he did not vacuum, dust, do laundry, do dishes, cook, or remove garbage; he drove a car to perform errands three times per week; he drove to the doctors' offices; he drove to the library once per month; Plaintiff painted landscape portraits three days per week; he visited an aunt once per week; Plaintiff received visitors; he read books and magazines for three hours per day; Plaintiff sat on the porch; he maintained regular telephone contact with his grown children, an aunt, cousins, and "about

8

a dozen" former colleagues; he maintained his checking account; Plaintiff walked around the block for exercise every day for thirty minutes with frequent stops; Plaintiff did not perform any home maintenance work or yard work; and he attended his grandchild's ball games once per week for an hour at a time (R. 267-68, 271-77, 280-81). Plaintiff stated he was "not allowed" to complete household chores because the doctors at Wheeling Health Right told him he could lift only ten pounds or less due to his having a "blip" in his lung and because his wife did not want him to do these chores (R. 268-70). Plaintiff stated he painted landscapes for two to three hours at a time but had to "sit for a while, and then . . . stand for a while" (R. 273). Plaintiff testified he had received physical therapy and was instructed to do four exercises, twice a day, ten times each; he asserted he could not do the complete exercises (R. 278-79). Plaintiff testified he smoked "about a half a pack" of cigarettes per day and drank eight to twelve beers once per month (R. 282).

Plaintiff testified at the administrative hearing that he could sit in a chair for thirty minutes if he could "wiggle around as much" as he wanted. Plaintiff asserted his back and legs started "knotting up" after thirty minutes (R. 284). Plaintiff stated he could stand for thirty to forty-five minutes if he could lean, move around, and shift his weight before his knees, legs, and back bothered him. Plaintiff testified it was easier for him to stand than it was for him to sit because he could "shift around." Plaintiff stated he could lift and carry thirty pounds for thirty or forty feet (R. 285). Plaintiff testified he did not experience any "problems" with his hands (R. 286). Plaintiff stated he could squat to retrieve something from the floor and that he could not bend at the waist to touch the floor or his ankles, but he could touch his knees with pain (R. 286-87). Plaintiff testified he could hold his arms parallel to the floor (R. 287). Plaintiff stated he could not raise his arms over his head at the same time because doing so caused "pinches in the back," but he could raise one arm at a time.

9

Plaintiff testified he could climb and descend steps slowly and with stopping (R. 288).

At the administrative hearing, the following question/answer exchange occurred between the ALJ and the VE and Plaintiff's attorney and the VE:

> ALJ: [Plaintiff] was born on March the 9th, 1953, and under the regulatory categories, he's considered to be a person closely approaching advanced age. He left school after he completed the ninth grade, but he subsequently attained his GED, so I'm going to give him credit for a high school education. . . . I'm going to ask you to provide me with jobs at both the medium and light level with the limitation that his person should avoid pulmonary irritants, such as gases, fumes, poor areas with poor ventilation . . . dust noxious odors, smoke and so forth. Are there jobs that this person could do? (R. 293, 295).

> VE: At both the medium . . . and light level? Yes, Your Honor, . . . . At the medium level, there would be the work of a – cafeteria attendant. There would be 82 jobs in the local economy and 120,700 in the national economy. There would be the work of an order filler. In the local economy, there are 35 jobs. In the national economy, 54,481 jobs. There would be the work of a packer. In the local economy, there are 45 jobs. In the national economy, 97,152 jobs (R. 295).

> ALJ: Is this a sampling of jobs at the medium level, or is it an exhaustive list? (R. 295).

> VE: It is a sampling, Your Honor. . . . At the light level, there would be the work of a cashier checker. In the local economy, there are 604 jobs. In the national economy, 960,058 jobs. There would be the work of a mail clerk. That would be working in private industry as opposed to working for the postal service. There would be 35 jobs in the local economy, and 79,258 in the national economy. . . . There would be the work of a sewing machine operator. In the local economy, there are 45 jobs. In the national economy, 114,248 jobs (R. 295-96).

> ALJ: All right, now, if I added the following limitations, how would they affect the availability of the jobs that you've named? That this person would need to have the option to sit or stand in the course of the workday, that he would be limited – his bending would be limited to the lesser of 45 – 40 to 45 degrees or the degree necessary for him to touch his knees, and that overhead work would be limited to one hand at a time over his head. How would that affect the availability of the jobs that you've named? (R. 296).

10

VE: The ability to work as a dining room attendant – excuse me, cafeteria attendant would be eliminated. The work of an order filler would be eliminated, and the work of a packer would be eliminated. . . . [T]he work of a cashier would be eliminated. However, this individual could still perform the work as a mail clerk and sewing machine operator (R. 297).

ALJ: Are there other jobs at the light level that would comprise all of these limitations, both in the first hypothetical and in the hypothetical with the additional limitations at the light level? (R. 297).

VE: There would be also the work at the light level that of an interviewer. In the local economy, there would be 78 jobs. In the national economy, 110, 916 jobs (R. 297).

ALJ: All right, now, would this job together with the mail clerk job and that of the sewing machine operator be a sampling of jobs that would conform to the hypothetical with all the limitations I've set out, or would it be an exhaustive list? (R. 297).

VE: It would be an exhaustive list, Your Honor (R. 297).

ALJ: If this person had to be off-task more than one unscheduled hour a day due to pain or fatigue or shortness of breath or any other impairment such as those alleged by Mr. Kennedy, how would that affect the availability of the jobs that you've named? (R. 298).

VE: There would be no jobs for this hypothetical individual (R. 298).

ALJ: Are the jobs that you cited in response to my hypothetical questions consistent with the descriptions in The Dictionary of Occupational Titles? (R. 298).

VE: Yes, Your Honor (R. 298).

ALJ: What about the sit/stand option? (R. 298).

VE: The sit/stand option is not defined in The Dictionary of Occupational Titles, nor is it defined in Social Security regulations. My opinion regarding the sit/stand option would be based on my having performed the job, having formally analyzed the job, or having become familiar with how the job is performed otherwise (R. 298).

Atty: The question that I have is in response to the second hypothetical question with the sit/stand option and the limitation on the bending and the overhead

11

work. You indicated that such an individual could still perform the mail clerk position, the sewing machine operator, and you added the interviewer. How can a sewing machine operator accommodate a sit/stand option? I mean how are they operating the sewing machine when they're standing (R. 298-99).

VE:     Well, the sit/stand option means, and as I apply it, that the individual could stand at will and essentially change postures at will. So the job is generally performed sitting, and the person can have a – take a break occasionally to stand and then resume working the job (R. 299).

Atty:   So when they were standing – because the job is performed in a seated position, while they were standing, then they would be off-task on the sewing machine position? (R. 299).

VE:     These jobs generally require the person to – well, actually the sewing machine generally is required sitting and then they could stand. So the job could not be performed while the person is standing IR. 299).

Atty:   So if an individual would need the customary sit/stand option, standing at will, they would be off-task presumably several times an hour? (R. 299).

VE:     Depending on how often that person needs to – (R. 299)

ALJ:    Well, while they're standing – (R. 299)

VE:     – change positions (R. 299).

ALJ:    – they're going to be off-task. Is that – I mean that's true, right? (R. 299).

VE:     Correct (R. 299).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Gibbs made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

12

3. The claimant's chronic obstructive pulmonary disease and sacroilitis are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the residual functional capacity to sit 6 hours with a sit/stand option and to stand and walk for 6 hours in an 8 hour workday. In addition, he is able to lift and [sic] 20 pounds occasionally and 10 pounds frequently. His capacity for light work is limited to bending to touching his knees and to reaching overhead one hand at a time. The claimant is precluded from exposure to dusts, fumes, odors, poor ventilation and smoke.

7. The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

8. The claimant is an "individual closely approaching advanced age" (20 CFR §§ 404.1563 and 416.963).

9. The claimant has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from semi-skilled work previously performed as described in the body of the decision (20 CFR §§ 404.1568 and 416.968).

11. Considering the types of work that the claimant is still functionally capable of performing in combination with the claimant's age, education and work experience, he could be expected to make a vocational adjustment to work that exists in significant numbers in the national economy. Examples of such jobs include work as an interviewer, 78 jobs regionally and 110,916 jobs nationally; a mail clerk, 35 jobs regionally and 79,258 jobs regionally [sic]; and a sewing machine operator, 47 jobs regionally and 114,248 jobs nationally. Furthermore, the vocational expert testified that the above-cited jobs are consistent wit the dictionary of Occupational Titles (Social Security Ruling 00-40p).

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)) (R. 22-23).

## IV. Discussion

## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

The Plaintiff contends:

1.  The ALJ erred in determining that the number of jobs available to Plaintiff was significant.

2.  The ALJ erred in finding Plaintiff capable of more than sedentary activity.

3.  Plaintiff cannot engage in substantial gainful activity (SGA) because his medical impairments would cause substantial absenteeism.

4.  The ALJ erred in failing to give controlling weight to medical evidence favorable to Plaintiff (CFR 404.1527(d)(2)).

The Commissioner contends:

1.  . . . [T]he VE testified that given Plaintiff's RFC and vocational abilities . . ., he could perform over 190,000 jobs in the national economy within such occupations as interviewer and mail clerk. (Defendant's brief at p. 7.)

2.  . . .[T]he ALJ noted no treating or examining physician had restricted Plaintiff's activities or identified exertional or non-exertional limitations, which were supported by objective medical evidence, that restricted [Plaintiff] from doing a wide-range [sic] of light work. (Defendant's brief at pp. 11-12.)

3.  . . . [T]he VE said Plaintiff could still perform over 190,000 other jobs which allowed him the option to change positions at will. Plaintiff cites to no specific evidence which establishes that he would be off-task [sic] or substantially absent from his job if he worked. (Defendant's brief at p. 13.)

4.  . . . [T]he ALJ noted . . . no treating or examining physician had restricted Plaintiff's activities or identified exertional or non-exertional limitations, which were supported by objective medical evidence, that restricted [Plaintiff] from doing a wide-range [sic] of light work. (Defendant's brief at p. 14.)

## C. Number of Jobs Available to Plaintiff

Plaintiff contends the ALJ erred in determining the number of jobs available to Plaintiff was significant. The Defendant contends the VE testified that, given Plaintiff's RFC and vocational abilities, he could perform over 190,000 jobs in the national economy within such occupations as interviewer and mail clerk.

20 C.F.R. §§ 404.1566 and 416.966 read, in part, as follows:

(a)  We consider that work exists in the national economy when it exists in significant numbers *either* in the region where you live or in several other regions of the country. (Emphasis added.) It does not matter whether –
    (1)  Work exists in the immediate area in which you live;
    (2)  A specific job vacancy exists for you; or
    (3)  You would be hired if you applied for work.

(b)  Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. . . . If work that you can do does not exist in the national economy, we will determine that you are disabled.

However, if work that you can do does exist in the national economy, we will determine that you are not disabled.

In the instant case, the VE identified three jobs the Plaintiff could perform with his limitations. The VE opined Plaintiff could perform the jobs of a mail clerk, sewing machine operator, and interviewer. In his brief, Plaintiff asserts the VE testified on cross examination that the job of sewing machine operator could not be performed with a sit/stand option because that person would be off task. (Plaintiff's brief at pp. 5-6.) The undersigned finds the VE did opine that one who required a sit/stand option would be off task during the course of a work day; however, he did not ultimately exclude the job of sewing machine operator from the sampling of jobs the Plaintiff could perform and the ALJ was correct in considering it in her decision. However, in considering only the 113 regional and 190,174 national jobs of mail clerk and interviewer as jobs available to Plaintiff, the undersigned finds that is a significant number.

One-hundred thousand, one-hundred and seventy-four jobs in the national economy is a significant number of employment opportunities for Plaintiff. As noted in the regulation, it is irrelevant if the jobs are in the immediate area of Plaintiff's residence, if there is a job vacancy for Plaintiff to fill, or if Plaintiff would be offered one of the jobs. The regulation requires that the jobs must exist in significant numbers in the national economy; in the instant case, a significant number of jobs does exist. Additionally, relative to what constitutes a significant number of jobs in the regional or local economies, the Fourth Circuit has held, in *Hicks v. Califano*, 600 F.2d 1048, 1051, that "approximately 110 jobs testified to by the vocational expert" was not an "insignificant number"; therefore 113 jobs in the regional economy is significant.

Plaintiff further argues that the ALJ failed to take "into account some of the factors listed in Hall, 837 F.2d 272, 274-275 (6th Cir. 1988)" in determining there were a "'significant' number of

16

jobs at which Plaintiff could work." (Plaintiff's brief at p. 6.) Plaintiff asserts those factors were 1) "Plaintiff has a severe level of disability" and 2) "Plaintiff's [credible] testimony at the hearing . . ." relative to his limitations. (Plaintiff's brief at p. 6.) In *Hall v. Bowen*, the Sixth Circuit defined those factors which impact the determination that a significant number of jobs exist which could be performed by an individual as "the level of claimant's disability; the reliability of the vocational expert's testimony, the reliability of the claimant's testimony; the distance claimant is capable of traveling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on." Additionally, the *Hall* court found "[t]he decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Id.* at 275. The ALJ in this case is not bound by Sixth Circuit precedent; however, she did consider those factors in her decision.

The ALJ considered Plaintiff's level of disability through her evaluation of the complete record, which included the following evidence from Wheeling Health Right, the opinions of state-agency physicians, the findings of tests and laboratory reports, and the records from Reynolds Memorial Hospital, in deciding Plaintiff's RFC and formulating the hypothetical questions posed to the VE. (R. 17-20).

A doctor at Wheeling Health Right opined Plaintiff's COPD was stable on September 6, 2003; a statement by Plaintiff on October 29, 2003, to a physician at Wheeling Health Right that his back pain had improved after treatment with Robaxin, Naproxen, Toradol, and Depro-Medrol; a doctor at Wheeling Health Right observed Plaintiff had good back posture, good range of motion, and stable COPD on October 29, 2003; a physician at Wheeling Health Right diagnosed Plaintiff with sacroilitis and chronic lumbosacral strain on January 21, 2004, after observing Plaintiff had an

antalgic gait, increased right sacroiliac joint pain, but full range of motion; and a Wheeling Health Right doctor's opinion that Plaintiff's lungs were clear on January 21, 2004 (R. 18). The ALJ weighed and considered the opinions of the state agency physicians, who found no exertional limitations on June 18, 2003, and then reduced Plaintiff's RFC to medium on November 6, 2003 (R. 18). The ALJ evaluated the diagnosis of acute bronchitis by a physician at Reynolds Memorial Hospital on October 3, 2003, for which Plaintiff was treated with Robitussin, Rhinocort, and Zithromax (R. 18). In addition to the findings and opinions of these physicians, the ALJ considered the January 5, 2003, and April 22, 2003, chest x-rays of Plaintiff, which showed no active pulmonary disease and the June 25, 2003, ventilatory function report, which showed a mild obstructive pulmonary impairment (R. 17, 18, 19). This evaluation demonstrates the ALJ did consider the level of Plaintiff's disability in finding that "[n]o treating or examining physician has restricted the claimant's activities or identified exertional or non-exertional limitations that are supported by objective medical evidence" (R. 19) and in determining there were a significant number of jobs at which Plaintiff could work.

In addition to considering Plaintiff's level of disability, the ALJ correctly relied on the qualified VE's testimony and thoroughly evaluated, weighed, and considered the extensive activities of daily living to which Plaintiff testified, including Plaintiff's testimony about his ability to drive (R. 19-21). Specifically, Plaintiff testified that he drove his wife to the grocery store once a month and that he drove and ran errands three times per week (R. 19). Plaintiff also testified he drove to the library for reading material one time per month (R. 273-74).

Finally, Plaintiff asserts the "VE was only able to specify two jobs after taking into account Plaintiff's limitations in standing, sitting and breathing." (Plaintiff's brief at p. 6.) The undersigned

finds this assertion to be in error. The VE named at least 113 jobs in two categories, not two jobs, which could be performed by Plaintiff (R. 22, 295-97).

For the above reasons, the undersigned finds the decision by the ALJ that "work ... exits in significant numbers in the national economy" that Plaintiff could perform comports with 20 C.F.R. §§ 404.1566 and 416.966 and is supported by substantial evidence.

### D. Light Work

Plaintiff alleges the ALJ erred in finding him capable of more than sedentary work. Defendant contends the ALJ found no treating or examining physician had restricted Plaintiff's activities or identified exertional or non-exertional limitations that were supported by objective medical evidence and that prevented him from doing a wide range of light work. (Defendant's brief at pp. 11-12.)

20 C.F.R. § 404.1567 defines sedentary and light work as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additionally limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

The ALJ found the following:

> The claimant has the residual functional capacity to sit 6 hours with a

sit/stand option and to stand and walk for 6 hours in an 8 hour workday. In addition, he is able to lift and [sic] 20 pounds occasionally and 10 pounds frequently. His capacity for light work is limited to bending to touching his knees and to reaching overhead one hand at a time. The claimant is precluded from exposure to dusts, fumes, odors, poor ventilation and smoke (R. 22).

In support of his contention that he could not perform any work greater than sedentary, Plaintiff asserts he is "unable to sit or stand for extended periods of time due to his pain"; "not . . . able to remain on his feet for a significant part of the workday"; and not able to "sit for most of the work day in order to operate any type of controls." (Plaintiff's brief at p. 7.) Additionally, to support his assertion that he could not perform the full range of light work, Plaintiff relies on that section of SSR 83-10 that defines the term "frequent" as meaning "occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."

As evidenced in the ALJ's ruling, Plaintiff's ability to perform light work was not full range, but limited to his bending to touching his knees, to his reaching overhead one hand at a time, and to his exposure to environmental hazards (R. 20, 22). Plaintiff's ability to stand and walk at the light work level was not further limited. The ALJ found Plaintiff could stand and walk for about six hours in an eight-hour workday, a finding that comports with the definition in SSR 83-10. The ALJ based his finding on Plaintiff's ability to perform light work on the evidence of record and testimony of Plaintiff himself.

The evidence of record contained no opinion by any physician that Plaintiff's ability to sit, stand, or walk was less than for light work. Neither Dr. Chin nor any of the doctors at Wheeling Health Right who treated Plaintiff for his respiratory condition opined that condition limited

20

Plaintiff's ability to sit, stand, or walk or limited Plaintiff's ability to do work at less than light work (R. 138, 191-92, 210-11, 215, 216, 217). Those physicians who treated Plaintiff for his complaints of back and shoulder pain did not limit his ability to sit, stand, or walk or opine as to his work level ability. On September 6, 2003, Plaintiff's reflexes were equal bilaterally and his straight leg raise test was negative. The doctor at Wheeling Health Right diagnosed back pain, prescribed medication, but did not opine that Plaintiff's ability to sit, stand, or walk was impaired and did not limit Plaintiff's ability to work (R. 18, 213). On September 9, 2003, Plaintiff's range of motion was limited due to pain, but the attending physician at the Emergency Department of Reynolds Memorial Hospital did not opine Plaintiff's ability to sit, stand, or walk or work at any level was impaired (R. 235). Additionally, on October 29, 2003, the Wheeling Health Right physician who treated Plaintiff for his back pain noted Plaintiff had good back posture and good range of motion. Plaintiff informed the doctor that his back pain had improved and was controlled with medication (R. 18, 232). On January 21, 2004, the physician at Wheeling Health Right, who treated Plaintiff for back pain, diagnosed sacroilitis, but did not opine Plaintiff's ability to sit, stand, or walk or work at any level was limited (R. 18, 230).

The ALJ also considered and weighed the opinions of the state agency physicians regarding Plaintiff's ability to sit, stand, or walk in formulating his opinion Plaintiff could perform light work. He noted that the "initial state agency determination dated June 18, 2003, found no exertional limitations" but did limit Plaintiff's exposure to fumes, odors, dust, gases and poor ventilation." The ALJ further discussed in his decision that the November 6, 2003 state agency physician "found the claimant capable of medium work" (R. 18). That state agency physician opined Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand

and/or walk for a total of about six hours in an eight-hour workday, and sit for a total of about six hours in an eight-hour workday (R. 220). Neither physician limited Plaintiff's ability to do work at the sedentary level.

In addition to the opinions of the treating, examining, and state agency physicians relative to Plaintiff's ability to sit, stand, or walk, the ALJ also considered and evaluated the medical tests. Plaintiff's November 23, 1996, MRI was normal; his January 5, 2003, chest x-ray was normal; his April 22, 2003 chest x-ray was normal; and the June 25, 2003, ventilatory function report was for "mild" obstructive pulmonary impairment (R. 18, 19, 134, 135, 195, 204-07). There were no medical tests or laboratory findings that supported Plaintiff's assertion that he was "unable to sit or stand for extended periods of time due to his pain." (Plaintiff's brief at p. 7.)

In making his determination that Plaintiff could perform light work, the ALJ also reviewed and evaluated Plaintiff's testimony. He noted the following:

> The claimant testified that 3 times a week, he sits/stands 2 ½ to 3 hours a day painting water-based portraits. He also testified that he can sit for 30 minutes before his back and legs knot up; he can stand 30-45 minutes before he has knee, leg and back pain; he can lift 30 pounds, he can squat and has pain when bending to his knees; he has no hand problems, and he can reach overhead with one arm at a time (R. 19).

The ALJ also considered Plaintiff's ability to drive, climb stairs, sit on porch, visit with friends, and manage his own finances (R. 19). Additionally, the ALJ evaluated and weighted Plaintiff's statement that Drs. West and Sullivan (with Wheeling Health Right) had restricted his lifting to ten pounds or less. The ALJ found this testimony was not supported by the evidence of record (R. 19). Plaintiff's testimony does not support a finding by an ALJ for sedentary work. Plaintiff could, according to his own testimony, sit, stand, and walk. Plaintiff testified at the administrative hearing that it was easier for him to stand than to sit because he could "shift around" (R. 285). The ALJ's

22

RFC included a sit/stand option that accommodated Plaintiff's need. Additionally, Plaintiff's testimony about his ability to lift supported the ALJ's finding as to light work. The Fourth Circuit has held, in *Lee v. Sullivan*, 945 F.2d 687, 693 (1991), that the "basic distinction between the two classifications [light work and sedentary work] is the weight-lifting ability of the claimant: 'sedentary work' involved 'lifting no more than 10 pounds at a time' and 'light work' included 'lifting no more than 20 pounds at a time.'" Inasmuch as Plaintiff testified he could lift and carry thirty pounds for sixty to eighty feet, a weight that exceeded the capacity for light work, a finding for light work by the ALJ was appropriate (R. 19, 285).

For the above stated reasons, the ALJ's finding that Plaintiff could perform light work is supported by substantial evidence.

### E. Substantial Gainful Activity

Plaintiff contends he cannot engage in substantial gainful activity (SGA) because his medical impairments would cause substantial absenteeism. In *Cornett v. Califano*, 590 F.2d 91, the Fourth Circuit opined the following: "The ability to work only a few hours a day or to work only on an intermittent basis is not the ability to engage in 'substantial gainful activity' so as to preclude disability benefits under Social Security Act. Social Security Act, § 1 et seq., 42 U.S.C.A. § 301 et seq." Plaintiff argues he could only work for a few hours a day and on an intermittent basis because he must stand on a regular basis due to his not being able to sit for extended periods and because his condition necessitates "fairly frequent hospital visits," especially for "fits of coughing and SOB." (Plaintiff's brief at p. 8.) Defendant argues Plaintiff offered "no specific evidence which establishes that he would be off-task or substantially absent from his job if he worked" and "Plaintiff submitted no opinion from an acceptable medical source which suggested that he would be either off-task [sic]

23

or, otherwise, substantially absent from his job if he worked." (Defendant's brief at p. 13.) The undersigned agrees with Defendant's assertion.

The medical tests and laboratory findings relative to Plaintiff's impairments do not support his contention that he could only work for a few hours a day and on an intermittent basis because of his need to stand on a regular basis due to his not being able to sit for extended periods and because his condition necessitated "fairly frequent hospital visits," especially for "fits of coughing and SOB." (Plaintiff's brief at p. 8.) Plaintiff's November, 1996, MRI was normal (R. 195); Plaintiff's November 15, 2002, thorax CT scan was positive for pneumonia, but "otherwise clear . . . and no pleural fluid" (R. 173); Plaintiff's January 5, 2003, chest x-ray showed normal heart, clear lungs, resolved left lung pneumonia, and no active pulmonary disease (R. 1335); Plaintiff's chest x-ray of April 22, 2003, showed no significant changes from the January 5, 2003, chest x-ray and was normal (R. 134); and Plaintiff's June 25, 2003, pulmonary function study showed mild COPD (R. 205). The ALJ considered and evaluated these test results and laboratory findings and relied on them in opining the "objective findings in the record do not support the claimant's subjective complaints" (R. 19-20).

Additionally, the ALJ found that "[n]o treating or examining physician has restricted the claimant's activities or identified exertional or non-exertional limitations that are supported by objective medical evidence" (R. 19). The record supports the ALJ's finding; the record does not support Plaintiff's assertion that he could only work for a few hours a day and on an intermittent basis. Dr. Chin diagnosed COPD, but did not opine his condition would necessitate frequent hospital visits or cause absenteeism from Plaintiff's work (R. 138, 192). Dr. Saludes' consultative examination of Plaintiff resulted in a diagnosis of COPD, but he did not opine Plaintiff would

require frequent hospitalization, thus causing Plaintiff to be absent from work or to work only a few hours per day (R. 166). The doctors at Wheeling Health Right treated Plaintiff for coughing spells and COPD, conditions which were treated with medications and stabilized. No treating physician at that facility limited Plaintiff to working only a few hours a day, limited his activities, or opined his condition would require frequent hospitalizations (R. 134, 215, 216). The doctors at Wheeling Health Right also treated Plaintiff for back pain with medications beginning in September, 2003 (R. 213-14). Plaintiff was observed to have good back posture and good range of motion in October 29, 2003 (R. 232). Plaintiff's gait was antalgic in January, 2004, and he was then diagnosed with sacroilitis and chronic lumbosacral strain, for which he was instructed to undergo physical therapy and prescribed Robaxin (R. 230). The doctor(s) treating Plaintiff for his back condition did not limit Plaintiff to working only a few hours a day, limit his activities, or opine he could work only on an intermittent basis. In her decision, the ALJ evaluated and weighed this evidence from the treating and consultative physicians in formulating Plaintiff's RFC and in accepting the testimony of the VE (R. 17-21)

Plaintiff was hospitalized once for shortness of breath and harsh coughing on October 6, 2003, which resulted in a diagnosis of acute exacerbated COPD and bronchitis. These conditions were treated with medications. The Reynolds Hospital physician attending Plaintiff on this occasion offered no opinion about the need for frequent hospital visits in the future(R. 234-35). Moreover, the record contained no other evidence of any emergency department visits by Plaintiff for treatment of shortness of breath and coughing. Plaintiff's assertion that his condition would require frequent visits to the hospital, thereby causing his activity to be so irregular that he could not maintain substantial gainful activity because of absenteeism, is not supported by the record of evidence.

Plaintiff, in his brief, asserts he would be off task from the job of sewing machine operator because of his inability to sit for extended periods of time, thereby eroding Plaintiff's substantial gainful employment. (Plaintiff's brief at p. 8.) In this brief, the undersigned addressed the issue of inclusion of the job of sewing machine operator in those jobs which the Plaintiff could perform in the national/regional economy. (See p. 16.) The undersigned's earlier discussion of the number of jobs available to Plaintiff (regional economy – 113 mail clerk and interviewer jobs; national economy – 190,174 jobs) is relevant here as to the ALJ's finding that there is substantial gainful activity available to Plaintiff which afford Plaintiff a sit/stand option.

For the above stated reasons, the undersigned finds the ALJ was correct in opining that "[t]he totality of the evidence, especially the objective and clinical findings of treating physicians clearly rebuts the claimant's contention that he is totally disabled from all forms of gainful employment" is correct and that the ALJ's decision relative to jobs available to Plaintiff based on the RFC is supported by the evidence of record (R. 20).

### F. Controlling weight

Plaintiff contends the ALJ erred in failing to give controlling weight to medical evidence favorable to Plaintiff as required by C.F.R. § 404.1527(d)(2). Plaintiff argues "breathing and coughing problems caused by emphysema, asbestosis and related ailments have been well-documented [sic] by Plaintiff's physicians in the record. At one point, Plaintiff is described as 'easily tachycardic' with very little stress (Tr. 215). Any level of exertion over that of which Plaintiff is capable could result in severe health repercussions. The ALJ erred in dismissing favorable medical evidence when such ailments are clearly documented, and when such failure could result in serious damage to Plaintiff's health." (Plaintiff's brief at pp. 8-9.) Defendant contends the

ALJ accurately noted that no treating or examining physician had restricted Plaintiff's activities or identified exertional or non-exertional limitations, which were supported by objective medical evidence, that restricted Plaintiff from doing a wide range of light work.

C.F.R. § 404.1527(d)(2) reads as follows:

> (d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

> (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

In conformance with C.F.R. § 404.1527(d)(2), the ALJ did not dismiss "favorable medical evidence" relative to Plaintiff's conditions. The ALJ weighed and evaluated the following clinical and laboratory diagnostic test results in evaluating Plaintiff's impairments: 1) January 5, 2003, chest x-ray which revealed no active pulmonary disease (R. 17); 2) April 22, 2003 chest x-ray that revealed no active pulmonary disease (R. 17); and 3) June 25, 2003, pulmonary function study showed mild COPD (R. 18).

Additionally, the ALJ considered, weighed, and relied on the diagnoses of Plaintiff's treating physicians and found "[t]he medical evidence indicates that the claimant has chronic obstructive

pulmonary disease, and sacroilitis, impairments that are 'severe' within the meaning . . ." (R. 17).

Those opinions evaluated by the ALJ are as follows:

1)      On March 26, 2003, a physician at Wheeling Health Right diagnosed shortness of breath with mixed emphysema and prescribed Atrovent and Albuterol (R. 18).

2)      On August 20, 2003, a physician at Wheeling Health Right diagnosed stable chronic obstructive pulmonary disease (R. 18).

3)      On September 6, 2003, a nurse practitioner at Wheeling Health Right observed Plaintiff's reflexes were equal and his straight leg raising test was negative relative to his reported back pain. She diagnosed back pain and prescribed Robaxin and Naproxen. She injected Plaintiff with Toradol and Depo-Medrol (R. 18).

4)      On October 9, 2003, a nurse practitioner at Wheeling Health Right observed some expiratory wheezing and rhonchi, diagnosed acute bronchitis, and prescribed medication (R. 18).

5)      On October 29, 2003, a doctor at Wheeling Health Right observed Plaintiff had good back posture and good range of motions. Plaintiff was diagnosed with back pain and stable chronic obstructive pulmonary disease. He informed the doctor his back pain had improved (R. 18).

6)      On January 21, 2004, a doctor observed antalgic gait, full range of motion, increased sacroiliac joint pain, clear lungs, range of motion to be to be full. Plaintiff's conditions were treated with medications (R. 18).

The ALJ relied on the opinions of those physicians and medical professional who treated

Plaintiff for breathing and coughing conditions and back pain in finding Plaintiff did have severe

impairments, but none of them limited Plaintiff's exertional and non-exertional activities. For that

evidence, the ALJ had to rely on the opinions of the state agency physicians.

The ALJ did assign weight and evaluate to the opinions of the state agency physicians as to

the exertional and non-exertional impairments of Plaintiff. The ALJ found the following:

> The opinions of the State Agency medical consultants must also be taken into account. As non-examining physicians, their opinions are not entitled to "controlling weight", [sic] but must be considered and weighed as those of highly qualified physicians who are expert in the evaluation of medical issues in disability claims

under the Social Security Act (Social Security Ruling 96-6p). The initial state agency determination dated June 18, 2003, found no exertional limitations. However, the claimant was found to have environmental limitations of avoidance of concentrated exposure to fumes, odors, dust, gases and poor ventilation (Exhibit C3F). The reconsideration State Agency determination dated November 6, 2003, found the claimant capable of medium work. He was found to have environmental limitations of avoidance of concentrated exposure to fumes, odors, dusts, gases and poor ventilation (Exhibit C6F) (R. 18).

Based on this assessment, it is clear the ALJ assigned weight to the opinions of the state agency physician and relied on those opinions in formulating Plaintiff's RFC, which limited Plaintiff to sitting for six hours with a sit/stand option; standing and walking for six hours in an eight-hour workday; lifting and carrying twenty pounds occasionally and ten pounds frequently; bending to touching his knees; reaching overhead one hand at a time; and exposure to dusts, fumes, odors, poor ventilation, and smoke (R. 20). Again, the ALJ did not dismiss the opinions of the state agency physicians relative to Plaintiff's exertional and non-exertional limitations.

Plaintiff further asserts in his brief that he was "described as 'easily tachycardic' with very little stress" and that "[a]ny level of exertion over that of which Plaintiff is capable could result in severe health repercussions." (Plaintiff's brief at p. 9.) First, Plaintiff was not described as becoming "easily tachycardic with very little stress." According to a review of the record from Wheeling Health Right, that description was provided by Plaintiff and noted by the physician. At that office visit, Plaintiff listed "mood swings"; "coughing spells" that felt as if he was "going to pop lung"; and a "'bad blip'" on his lung as conditions for which he needed treatment that day. The physician, however, observed Plaintiff's "CAD [was] stable" and did not offer any treatment for tachycardia (R. 215). Additionally, Plaintiff's assertion that "severe health repercussions" could occur if Plaintiff performed any level of exertion is unfounded. As discussed in the body of this decision, no physician -- treating, examining, or consultative -- offered such an opinion.

29

For the above enunciated reasons, the undersigned finds substantial evidence supports the ALJ's assignment of weight to the medical opinions found in the record of evidence.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Statement of Errors be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable W. Craig Broadwater, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce,* 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins,* 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn,* 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this __12__ day of April, 2006.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE